# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF KENTUCKY
# CENTRAL DIVISION
# AT LEXINGTON

| | |
|---|---|
| LEXINGTON H-L SERVICES, INC., d/b/a Lexington Herald-Leader, | CIVIL ACTION NO. 5:17-154-KKC |
| Plaintiff, | |
| V. | **OPINION & ORDER** |
| LEXINGTON-FAYETTE URBAN COUNTY GOVERNMENT, | |
| Defendant. | |

\*\*\* \*\*\* \*\*\*

This matter is before the Court on the motion of the plaintiff, Lexington H-L Services, Inc., d/b/a Lexington Herald-Leader, for a preliminary injunction. (DE 13).

Through its motion, the Herald-Leader seeks to enjoin the enforcement of a Lexington-Fayette Urban County Government[1] ordinance regarding the delivery of "unsolicited written materials."

The Court held a hearing on the Herald-Leader's motion for injunctive relief and took the matter under advisement. (DE 24). Having considered the parties' written filings and oral arguments, the Court will grant the Herald-Leader's motion for a preliminary injunction. (DE 13).

Also before the Court is the Herald-Leader's motion for leave to file a supplemental memorandum. (DE 26). That motion will also be granted.

---

[1] In order to avoid repetitive use of an acronym, the Court will refer to the defendant, the Lexington-Fayette Urban County Government, as simply either "Lexington" or "the city."

1

## I. Background

The facts of this case are not extensive, and a simple recitation will suffice for purposes of this opinion.

The Herald-Leader sells and distributes numerous publications, including *The Community News*, which is a weekly four- to six-page non-subscription publication. (DE 13, Mtn. at 2). *The Community News* contains local news and advertising for the city of Lexington, Kentucky, and the surrounding area. (DE 13, Mtn. at 2). The Herald-Leader delivers *The Community News* to businesses and residents in Fayette and neighboring counties (DE 1, Compl. ¶ 13). *The Community News* is delivered free of charge to more than 100,000 households each week. (DE 14, Friday Aff. ¶ 6).

The Herald-Leader distributes *The Community News* by various means, including driveway delivery.[2] (DE 14, Friday Aff. ¶ 8). However, the Herald-Leader's driveway method of delivering *The Community News* would be prohibited by an ordinance that Lexington has adopted.

That ordinance, which will go into effect on May 1, 2017, permits the delivery of "unsolicited written materials" only to six specific locations: (1) on a porch, if one exists, nearest the front door; (2) securely attached to the front door; (3) through a mail slot, if one exists; (4) between an exterior front door, if one exists and is unlocked, and an interior front door; (5) in a distribution box located on or adjacent to the premises, if permitted; or (6) personally with the owner, occupant, or lessee of the premises. Lexington, Ky., Ordinance No. 25-2017 (March 2, 2017). The ordinance provides for civil penalties for violations. *Id.*

Shortly after the ordinance was adopted, the Herald-Leader filed suit in this Court, claiming that the ordinance would violate its free speech and free press rights under the First

---

[2] The Court recognizes that items tossed toward a driveway may instead land in a yard or on a sidewalk.

Amendment. (DE 1). However, the full merits of the Herald-Leader's case are not currently before the Court. Instead, the Court must address whether the Herald-Leader has demonstrated that it is entitled to injunctive relief while this action is pending. (DE 13).

## II. Discussion

A district court gauges a request for a preliminary injunction based on four factors: (1) the plaintiff's likelihood of success on the merits; (2) irreparable harm to the plaintiff absent injunctive relief; (3) substantial harm to others resulting from an injunction; and (4) the broader public interest. *Michigan State AFL-CIO v. Schuette*, 847 F.3d 800, 803 (6th Cir. 2017).

The contours of the First Amendment will guide the Court's discussion on each of these elements,[3] and although each factor is important, "[w]hen a party seeks a preliminary injunction on the basis of the potential violation of the First Amendment, the likelihood of success on the merits often will be the determinative factor." *Connection Distrib. Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998).

In its motion for a preliminary injunction, the Herald-Leader challenges the city's ordinance as violating the paper's free speech and free press rights.[4] The Herald-Leader attacks Lexington's ordinance as both an impermissible content-based restriction on speech and as an unreasonable, content-neutral restriction on the time, place, and manner of speech.

---

[3] The First Amendment states in full: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the government for a redress of grievances." U.S. Const. amend. I.

[4] The rights secured by the First Amendment apply to the states and local governments through the operation of the Fourteenth Amendment. *See Gitlow v. New York*, 268 U.S. 652, 666 (1925) ("For present purposes we may and do assume that freedom of speech and of the press—which are protected by the First Amendment from abridgment by Congress—are among the fundamental personal rights and 'liberties' protected by the due process clause of the Fourteenth Amendment from impairment by the States.").

At the hearing, the Herald-Leader presented a different angle to its claims, citing *Minneapolis Star & Tribune Co. v. Minnesota Commissioner of Revenue*, 460 U.S. 575 (1983), for the proposition that Lexington's ordinance unconstitutionally targets the press.

Because different kinds of restrictions on speech are subjected to different levels of scrutiny under the law, the Court will separately analyze each of the Herald-Leader's theories.

### a. Whether the Herald-Leader has a likelihood of proving that Lexington's ordinance is content-based

The Herald-Leader first argues that Lexington's ordinance is a content-based restriction on speech, which would require the Court to closely scrutinize the ordinance.

Content-based laws are "those that target speech based on its communicative content." *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2226 (2015). "Because strict scrutiny applies either when a law is content based on its face or when the purpose and justification for the law are content based, a court must evaluate each question before it concludes that the law is content neutral and thus subject to a lower level of scrutiny." *Id.* at 2228. Under strict scrutiny review, the city would be required to show that the ordinance is narrowly tailored to further compelling state interests. *Id.*

In this case, the parties do not dispute that Lexington's ordinance is facially content-neutral, so the Court must ask the second question—whether the city's purpose and justification for the ordinance were content-based.

A reviewing court must strictly scrutinize facially content-neutral laws if the laws "cannot be justified without reference to the content of the regulated speech, or [if they] were adopted by the government because of disagreement with the message [the speech] conveys." *Id.* at 2227 (internal quotation marks omitted) (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)).

In the Herald-Leader's view, Lexington, in enacting the ordinance, targeted *The Community News*. The Herald-Leader also argues that the record demonstrates the ordinance is content-based because Lexington councilmembers considered materials that discussed the distribution of "unsolicited advertising supplements." (*See* DE 13-2; DE 13-3). However, the Court is not convinced that Lexington's purpose and justification for adopting the ordinance were motivated by any disagreement with the messages or content being conveyed.

Instead, it appears likely that the ordinance *can* be justified without reference to the content of the regulated speech and that the ordinance was *not* adopted by the city because of any disagreement with the message conveyed by *The Community News* or by any other distributor of unsolicited written materials. *See Reed*, 135 S. Ct. at 2227.

Thus, the Herald-Leader has not shown a likelihood of success on either avenue to strict scrutiny—that is, it has not shown the ordinance to be facially content-based or that the purpose and justification for the ordinance were content-based. This leads the Court to examine whether the ordinance is a reasonable, content-neutral restriction on the time, place, and manner of speech.

**b. Whether the Herald-Leader has a likelihood of proving that Lexington's ordinance is an unreasonable, content-neutral restriction on the time, place, and manner of speech**

The Herald-Leader has never wavered in its assertion that Lexington's ordinance is content-based. However, it did advance the alternative theory that Lexington's ordinance would fail constitutional review even if examined as a content-neutral regulation of speech.

Laws that are content-neutral and do not have an improper purpose are "subject to lesser scrutiny." *Id.* at 2232. To qualify as a reasonable time-place-and-manner regulation of speech, the law must: (1) be content-neutral; (2) serve a significant government interest; (3) be

narrowly tailored to serve that government interest; and (4) leave open ample alternative channels of communication. *Jobe v. City of Catlettsburg*, 409 F.3d 261, 267 (6th Cir. 2005).

The Herald-Leader contends that Lexington's ordinance cannot withstand this intermediate standard of review. Here, the paper disputes the interests asserted by the city and argues that the ordinance is not sufficiently tailored to the interests it purports to address. The Herald-Leader also argues that the ordinance does not leave open ample alternative channels of communication.

Before proceeding further, perhaps, the Court should address a particular aspect of the Herald-Leader's challenge to Lexington's ordinance—that is, the Herald-Leader's argument that Lexington's ordinance infringes on its rights, as a newspaper, to distribute information to the public.[5]

This country has "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." *New York Times Co. v. Sullivan*, 376 U.S. 254, 271 (1964). Moreover, within this commitment, "[a] foremost consideration is the safeguarding of the constitutional rights of newspapers; a goal which is a significant, if not vital, First Amendment concern." *S. New Jersey Newspapers, Inc. v. New Jersey Dep't of Transp.*, 542 F. Supp. 173, 182 (D.N.J. 1982) (hereinafter "*New Jersey Newspapers*").

These rights are based in large part on the public's need for information to engage in social, commercial, and civic life. As the Supreme Court expounded 140 years ago, "[l]iberty of circulating is as essential to that freedom [of the press] as liberty of publishing; indeed, without the circulation, the publication would be of little value." *See Ex parte Jackson*, 96 U.S. 727, 733 (1877).

---

[5] Practically, this argument will be most salient within the Court's consideration of the third and fourth factors of the time-place-and-manner review.

The broad protection designed to promote the communication of vital information leads the Court to question whether the *The Community News* is really a newspaper or a publication worthy of or entitled to the protection of the press discussed in the body of existing First Amendment law. At first blush, *The Community News* seems to be four to six pages of advertising with a little bit of editorial content included for good measure. It is only logical to question whether this kind of publication is entitled to the revered status and wide latitude of protection afforded to publications of true public significance.

Nonetheless, the Court will review this publication as non-commercial speech "because it involves more than just a mere proposal for a commercial transaction." *Distrib. Sys. of Am., Inc. v. Village of Old Westbury*, 862 F. Supp. 950, 957 (E.D.N.Y. 1994) (citing *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 420 (1993)) (district court finding publication that "contain[ed] some local and general news stories, but predominantly carrie[d] local advertisements" to be non-commercial speech).[6]

Accordingly, the Court will review Lexington's ordinance under a lower standard of review, one often referred to as intermediate scrutiny, because, at least in form, the ordinance does not ban the Herald-Leader from delivering *The Community News*. *See New Jersey Newspapers*, 542 F. Supp. at 184 ("The court does agree that this case differs somewhat from the total prohibition cases cited above and should be analyzed using the approach employed by the Supreme Court to evaluate zoning ordinances or similar 'content-neutral' statutory prohibitions which infringe, even incidentally, upon the exercise of First Amendment rights.").

As discussed above, the Herald-Leader has not shown a likelihood of success on the merits of its claim that Lexington's ordinance is a content-based restriction of speech. On its face,

---

[6] However, the line between commercial and non-commercial speech is not always clear, and publications such as *The Community News* only further blur the line.

7

the ordinance is content-neutral. Moreover, the purpose and justification for the ordinance were likely content-neutral.

The next question to address is whether Lexington has put forth any significant government interests. The preamble to Lexington's ordinance cites several objectives the city hopes to further, including reduction of unwanted litter and visual blight and prevention of damage to or interference with private property. Lexington, Ky., Ordinance No. 25-2017.

Although the Herald-Leader disputes the quantum of evidence put forth by the city and the legitimacy of the interests, courts have recognized aesthetic and property interests as significant. *Jobe v. City of Catlettsburg*, 409 F.3d 261, 268 (6th Cir. 2005) (noting that an ordinance furthered two significant government interests: (1) prohibiting litter and visual blight and (2) "individuals' interests in having their private property left alone by those who do not have permission to use it").

The Herald-Leader attempts to distinguish its case from a factually similar challenge brought by *The (Louisville) Courier-Journal* in the Western District of Kentucky. *Courier-Journal, Inc. v. Louisville/Jefferson Cty. Metro Gov't*, No. 3:09cv-449-S, 2009 WL 2982923 (W.D. Ky. Sept. 11, 2009)). In a parenthetical citation in its motion, the Herald-Leader argues that the district court in the *Courier-Journal* case was presented with "extensive evidence" in support of the ordinance, including testimony from the director of the sewer district regarding sewage clogging caused by newspaper baggies and testimony from the Louisville Police Department regarding security concerns. (DE 13, Mtn. at 10–11). The Court notes that Lexington had comparable evidence to consider before enacting its ordinance. (See DE 22-5, Agenda, at 25–26) (letter from director of division of water quality and letter from chief of police).

At this stage of the litigation, it appears unlikely that the Herald-Leader would be able to demonstrate that the interests asserted by the city are not significant. Further, the debate

8

in First Amendment cases often concerns not whether the interests put forth by the government are true, but whether the method chosen by the government to advance those interests is properly tailored. So it is with this case.

Under intermediate scrutiny, "as the Supreme Court has 'emphasized on more than one occasion, when a content-neutral regulation does not entirely foreclose any means of communication, it may satisfy the tailoring requirement even though it is not the least restrictive or least intrusive means of serving the statutory goal." *Jobe*, 409 F.3d at 268 (quoting *Hill v. Colorado*, 530 U.S. 703, 726 (2000)). Further, "the requirement of narrow tailoring is satisfied so long as the . . . regulation promotes a substantial government interest that would be achieved less effectively absent the regulation." *Id.* (quoting *Ward*, 491 U.S. at 798 ) (internal quotation marks omitted). To state this requirement another way, Lexington's ordinance must curtail no more speech than is necessary to accomplish its purpose. *Id.* at 269 (citing *City of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 810 (1984)).

On this prong, the paper essentially presents two arguments. First, the paper contends that the city has a less restrictive alternative available to banning deliveries to areas other than those permitted by the ordinance. Second, the paper asserts that the ordinance is not narrowly tailored because solicited written materials, including the Herald-Leader's flagship publication, the *Lexington Herald-Leader*, can still be distributed to the areas proscribed by the ordinance. The Court will discuss these arguments in reverse order.

To address whether the ordinance is underinclusive, the Court must discuss the difference between "solicited" and "unsolicited" written materials. The ordinance defines "unsolicited written material" as "[a]ny written materials delivered to any premises without the express invitation or permission, in writing or otherwise, by the owner, occupant, or lessee of such premises." Lexington, Ky., Ordinance No. 25-2017.

The distinction between these types of materials does not go to content, but rather to the manner in which the materials are delivered. Individuals or businesses know solicited materials will be delivered to their premises, and they have agreed to that delivery. In fact, they expect it. Practically, solicited materials are more likely to be picked up and disposed of properly.

Unsolicited materials, on the other hand, are those that individuals or businesses have not expressly agreed to receive. The concern with these materials is that they will remain where they were distributed because the recipient has less interest in retrieving them.

In *Taxpayers for Vincent*, the Supreme Court upheld, in an as-applied challenge, an ordinance that prohibited posting of signs on public property, noting that it was the medium of the expression that constituted the source of the evil that Los Angeles sought to curtail. 466 U.S. at 810. ("With respect to signs posted by appellees, however, it is the tangible medium of expressing the message that has the adverse impact on the appearance of the landscape. . . . Here, the substantive evil—visual blight—is not merely a possible by-product of the activity, but is created by the medium of expression itself.").

The Court finds that analysis controlling here. Lexington can likely show that it targeted unsolicited written materials because of the nature of those materials, namely that they are paper materials distributed in a manner that makes them less likely to be gathered from a driveway, yard, or sidewalk.

Next, the Herald-Leader argues that the city must pursue a less restrictive option for dealing with the problems caused by the paper's chosen method of delivery. In support of this claimed alternative, the Herald-Leader presents the "opt-out" option.

This option refers to the ability of individuals to request to have their addresses removed from *The Community News*' delivery list. To assist individuals in opting out of receiving *The Community News*, the Herald-Leader prints a banner above-the-fold on the front page of each

edition of *The Community News* with an email address or a phone number to contact to request removal from the delivery list. (DE 14-1, Ex. A, Copy of *The Community News*).

The Herald-Leader contends that the city must pursue the "resident education option" because "[s]imple promotion of the ability to opt out of delivery of *The Community News* has been proven to reduce unwanted delivery in Fayette County . . . ." (DE 13, Mtn. at 14). This option, in the view of the paper, would help reduce the amount of materials on driveways and yards in Lexington without infringing on its ability to cost-effectively deliver the paper.

On this point, the Court does see the opt-out option as a potential less restrictive means by which the city could seek to advance its interests in aesthetics and protecting private property. Further, at least one councilmember stated that educating constituents in her district about the opt-out option had been successful. (DE 14-2, Tr. Jan. 17, 2017 Comm. Mtg. at 25:22–26:8). As such, the Herald-Leader has shown a likelihood of success on the merits of its claim that the opt-out option is a less restrictive alternative.

Now, the Court will address the final factor of the time-place-and-manner analysis—whether the ordinance leaves open ample alternative channels of communication.

On its face, the ordinance permits deliveries of unsolicited written materials in six-specified locations. Yet, the Herald-Leader's method of driveway delivery is not one of the approved methods under the ordinance. The Herald-Leader's challenge, then, is a functional one.

Here, the Herald-Leader asserts that the ordinance's ban on deliveries to areas other than those permitted by the ordinance acts as a *total ban* on its ability to deliver *The Community News* because any other method of delivery would be cost prohibitive. (DE 13, Mtn. at 6) ("If enforced, the Ordinance will have the effect of ending all delivery service of *The Community News*.").

This is where the Herald-Leader's protected rights of distribution are implicated, and the Court is left with two potentially incompatible interests. On the one hand, Lexington has an interest in reducing litter and visual blight and in preventing interference with and damage to personal property. On the other hand, the Herald-Leader has rights under the First Amendment to distribute its speech, *and* individuals have rights under the First Amendment to receive information. The true question, though, is whether the Herald-Leader has a right to distribute information in an economically beneficial manner.

In the case brought by the Louisville Courier-Journal challenging a nearly identical ordinance in Louisville, Kentucky, the Western District of Kentucky found that "[t]he purported lack of economically feasible alternatives for the Courier [was] not a basis upon which to find the ordinance unconstitutional." *Courier-Journal*, 2009 WL 2982923, \*6. The Western District cited a Third Circuit case for the proposition that while a newspaper may have the right to speak, it does not have the right to speak profitably. *Id.* (citing *Pitt News v. Fisher*, 215 F.3d 354, 366 (3d Cir. 2000)).

However, the Court finds that Third Circuit case to be inapposite, even more so because the law that was originally upheld in that case was later found to be unconstitutional. *See Pitt News v. Pappert*, 379 F.3d 96, 111 (3d Cir. 2004). Further, that case did not deal with a newspaper's distribution rights.

Moreover, the Herald-Leader does not explicitly challenge its ability to make a certain level of profits. Instead, the paper argues that the delivery methods left open by the ordinance would be cost-prohibitive. Phrasing the issue in this way may result in a distinction without a difference, but the Court recognizes that an individual's or entity's distribution rights do not necessarily implicate economic concerns. *See Young v. American Mini Theatres, Inc.*, 427 U.S. 50, 78 (1976) (Powell, J., concurring) ("The inquiry for First Amendment purposes is not concerned with economic impact; rather, it looks only to the effect of this ordinance upon

freedom of expression."); *see also News & Observer Publ'g Co. v. Raleigh-Durham Airport Auth.*, 597 F.3d 570, 577–78 (4th Cir. 2010) ("First we measure the Authority's restriction on the Publishers' protected expressive activity, namely, newspaper distribution. This analysis hinges not upon a projected difference in newspaper sales but rather upon the Publishers' access to Airport users for speech purposes.").

Moreover, in upholding a Kentucky city's ordinance that prohibited leaflets from being placed on private cars without the owner's consent, the Sixth Circuit noted that "[b]y any measure of alternative channels of communication, the City of Catlettsburg has given its citizens numerous ways to distribute literature and information in an *inexpensive*, efficient and productive manner." 409 F.3d at 262, 270 (emphasis added).

Here, the Herald-Leader maintains that providing deliveries in compliance with the ordinance is not feasible within its current business model. In support of this claim, the Herald-Leader's publisher testified at the hearing that complying with the ordinance would double the Herald-Leader's cost for distributing *The Community News*.

Presented with this evidence, the Court cannot say that the delivery methods permitted by the ordinance likely leave open "inexpensive" alternative routes for communication, at least in the case of *The Community News*.

Though this Court rarely has opportunity to cite the Supreme Court of Wyoming, that court's rationale in *Miller v. City of Laramie* is particularly useful for this Court's consideration of the Herald-Leader's distribution rights. 880 P.2d 594 (Wyo. 1994). In that case, the Equality State's highest court held a littering ordinance unconstitutional as applied to a newspaper because of the burden the ordinance placed on the newspaper's distribution rights:

> We hold that Laramie may not ban all distribution of noncommercial speech materials which it views as litter under its wide-sweeping ordinance. It may place reasonable restrictions on such distributions so long as they do not have

13

> the effect of squelching legitimate speech which is protected by the constitution and so long as Laramie can demonstrate that other substantial means of communicating such speech are meaningfully available, including economic feasibility.

*Id.* at 598.

The Supreme Court of Georgia addressed a similar First Amendment challenge in *Statesboro Publishing Co. v. City of Sylvania*, 516 S.E.2d 296 (Ga. 1999). In that case, the Peach State's highest court found an ordinance that prohibited delivery of free printed materials to yards, driveways, and porches to be unconstitutional. *Id.* at 297. Language from that case is also instructive: "A city cannot limit the speaker or publisher to methods of delivery that are prohibitively expensive, such as mail or hand delivery . . ." *Id.* at 299.

The analysis in these state court decisions gives great weight to the Herald-Leader's assertions concerning its distribution rights. In light of these opinions, the Court finds the Herald-Leader has demonstrated a likelihood of success on the merits of its claim that Lexington's ordinance does not leave open ample alternative channels of communication.

### c. Whether the Herald-Leader has a likelihood of success on the merits under *Minneapolis Star*

Lastly, the Herald-Leader argues that the Supreme Court's decision in *Minneapolis Star* controls the outcome of this case. The Herald-Leader posits that, in *Minneapolis Star*, the Supreme Court "found that a facially content-neutral tax on ink and paper used in newspaper publications violated the First Amendment because it was targeted at a small group of newspapers." (DE 26-1, Mem. at 3).

The Court recognizes that Lexington's ordinance does not impose a tax upon the Herald-Leader. Instead, the paper faces potential civil penalties if it continues driveway deliveries of *The Community News* within Fayette County. Although *Minneapolis Star* does not seem to be directly controlling because no tax is at issue, the Court will briefly indulge the Herald-Leader's legal theory.

In *Minneapolis Star*, the Supreme Court explained that "[a] tax that burdens rights protected by the First Amendment cannot stand unless the burden is necessary to achieve an overriding governmental interest." *Minneapolis Star*, 460 U.S. at 582.

In discussing the level of scrutiny to be applied, the Supreme Court noted that courts have "long upheld economic regulation of the press," but that "[t]he cases approving such economic regulation, however, emphasized the general applicability of the challenged regulation to all businesses, suggesting that a regulation that singled out the press might place a heavier burden of justification on the State . . . ." *Id.* at 583 (internal citations omitted).

Here, the ordinance is one of general applicability because it does not distinguish among who may be cited for violating its provisions. However, the Herald-Leader contends that the ordinance is, in effect, a differential burden on it as a member of the press.

As the Supreme Court discussed in *Minneapolis Star*, "differential treatment, unless justified by some special characteristic of the press, suggests that the goal of the regulation is not unrelated to suppression of expression, and such a goal is presumptively unconstitutional." *Id.* at 585.

However, the Court finds it likely that Lexington could present a strong argument that a "special characteristic of the press" motivated it in this case, namely the paper medium of *The Community News* and other unsolicited written materials. Given the unlikelihood of success for the Herald-Leader on this argument, any analysis of a heightened level of scrutiny from *Minneapolis Star* is unwarranted.

### d. Other preliminary injunction factors

Although the bulk of the discussion for whether to issue a preliminary injunction in a First Amendment case will be on a plaintiff's likelihood of success, the other three factors are also important.

As to irreparable harm, "it is well-settled that 'loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'" *Connection Distrib.*, 154 F.3d at 288 (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality)). "Thus, to the extent that [the Herald-Leader] can establish a substantial likelihood of success on the merits of its First Amendment claim, it also has established the possibility of irreparable harm as a result of the deprivation of the claimed free speech rights." *Id.*

As described above, the Herald-Leader has shown a substantial likelihood of success on the merits of its constitutional challenge to Lexington's ordinance as an infringement of its distribution rights. Thus, the factor of irreparable harm is also present in this case.

Additionally, if the plaintiff shows a substantial likelihood that the challenged law is unconstitutional, no substantial harm to others can be said to inhere in its enjoinment. *Deja Vu of Nashville, Inc. v. Metro. Gov't of Nashville & Davidson Cty.*, 274 F.3d 377, 400 (6th Cir. 2001). Moreover, "it is always in the public interest to prevent violation of a party's constitutional rights." *Id.* (internal quotation marks omitted).

All factors taken together will lead the Court to grant the Herald-Leader's request for a preliminary injunction to prevent enforcement of Lexington's ordinance while this action is pending.

### III. Conclusion

The Court recognizes that Lexington enacted this ordinance in response to concerns that it reasonably sees as needing remedied. However, the First Amendment provides great protection to a newspaper's rights to disseminate information to the public, and the rights afforded by the First Amendment must be vigorously guarded.

Because of this, the Herald-Leader has demonstrated a likelihood of success on the merits of its claim that Lexington's ordinance would violate its distribution rights, and its motion for a preliminary injunction will be **GRANTED**. (DE 13).

Accordingly, it is hereby **ORDERED** that:

(1) The Herald-Leader's motion for preliminary injunction is **GRANTED** (DE 13); and

(2) The Herald-Leader's motion for leave to file a supplemental memorandum is also **GRANTED.** (DE 26).

(3) The Lexington Fayette-Urban County Government and its agents and assigns are **ENJOINED** from enforcing Ordinance No. 25-2017.

Dated April 28, 2017.

KAREN K. CALDWELL, CHIEF JUDGE
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY