UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION AT LEXINGTON
CIVIL NO. 5:17-CV-154-KKC

LEXINGTON H-L SERVICES INC.
  d/b/a LEXINGTON HERALD-LEADER                                        **PLAINTIFF**

VS.

LEXINGTON-FAYETTE URBAN
  COUNTY GOVERNMENT                                                **DEFENDANT**

### LFUCG'S TRIAL BRIEF AND MEMORANDUM IN
### SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

The Lexington-Fayette Urban County Government ("LFUCG"), submits this paper as its trial brief and memorandum in support of its motion for summary judgment. The LFUCG will in this paper summarize the background of the Ordinance at issue and the history of the court proceedings, state the issues it believes have been decided and the issue remaining, and demonstrate that there is no genuine issue of material fact on the remaining issue and that the LFUCG is entitled to a summary judgment dismissing this action as a matter of law.

### BACKGROUND

**Issues decided**

Lexington H-L Services Inc. d/b/a Lexington Herald-Leader ("Herald-Leader") seeks in this action to preclude the LFUCG from enforcing an Ordinance requiring all unsolicited written materials delivered to residences in Fayette County be left at one of six designated locations, all of which are located at or around the door or porch of the residence, or promote deliveries which will reduce litter and blight and promote public safety.[1] This Court previously enjoined enforcement of the Ordinance in a decision issued on April 28, 2017 (published at 259 F. Supp.

---

[1] The Ordinance requires delivery of unsolicited written materials be made by: (1) leaving them on a front porch; (2) attaching them to a front door; (3) inserting them through a mail slot; (4) placing them between an exterior and interior front door; (5) placing them in a distribution box; or (6) delivering them personally to the occupant.

2d 659), but the injunction was reversed and vacated by the Sixth Circuit Court of Appeals in a decision issued on January 9, 2018 (published at 879 F.3d 224). These decisions have established several key points; specifically:

✓      The Ordinance is content-neutral on its face. 879 F.3d at 228 n.1; 259 F. Supp. 2d at 663.

✓      Reducing litter and blight are substantial governmental interests. 879 F.3d at 228 n.2; 259 F. Supp. 2d at 665, 667.

✓      The LFUCG was entitled to rely on evidence gathered by Louisville and Jefferson County, Kentucky, when it enacted a similar ordinance, without having to incur the expense of duplicating the data. 879 F.3d at 230.

✓      The LFUCG had evidence comparable to that of Louisville and Jefferson County when it enacted the LFUCG Ordinance. 259 F. Supp. 2d at 665-66.

✓      The LFUCG was not required to choose the least restrictive, or even a less restrictive means of advancing the governmental interests advanced by the Ordinance. As the Sixth Circuit explained: "Although we are skeptical that opt-out lists are a comparable alternative to the restrictions of the Ordinance, . . . the Supreme Court has repeatedly rejected the notion that restrictions on the time, place, or manner of speech violate the First Amendment merely because a less restrictive alternative is available." 879 F.3d at 232.

✓      The Ordinance "leaves open ample alternative means of communication" and "preserves numerous methods for distributing written materials." 879 F.3d at 233.[2]

---

[2] Although these findings were made during the injunction phase, there is no reason to believe that the discovery permitted by the Court has altered these findings. Indeed, although the Court permitted the Herald-Leader five depositions, it only took two, and each of those only lasted about one hour.

**Issue remaining**

At the telephonic conference on March 27, 2018, the Court suggested that the key issues regarding the Ordinance had been decided during the injunction phase, but counsel for the Herald-Leader requested discovery to test the "*bona fides*" of the Ordinance. Although he did not explain his use of "*bona fides*" the LFUCG assumes it was used consistent with both its ordinary and legal meanings -- to suggest that the LFUCG's concerns about private property, water quality, blight, safety and litter were not the authentic and good faith bases for the Ordinance. *See Webster's Third New Int'l Dictionary* 250 (2002)(defining "*bona fides*" as good faith; lack of deceit or fraud); *Black's Law Dictionary* 199 (9th ed. 2009)(defining "*bona fides*" as acting without fraudulent intent or malice). The Sixth Circuit predicted this approach when it noted that the Herald-Leader "argues that 'further factual development' will reveal that [the LFUCG's stated governmental purposes] are merely pretext for the [LFUCG's] intent to disrupt the distribution of . . . *The Community News*." 879 F.3d at 228 n.2.

Accordingly, it appears that the Herald-Leader hopes to establish that the Ordinance, although content neutral on its face, was motivated by a disagreement with the content of *The Community News* or *The Lexington Herald-Leader*. *See Reed v. Town of Gilbert*, ___ U.S. ___, 135 S.Ct. 2218, 2227 (2015)(recognizing that a facially neutral law restricting speech will be considered content based if it can only be justified by reference to the content of the speech or was adopted because of a disagreement with the message conveyed).[3]  As will be demonstrated in this memorandum, the Ordinance is easily justified without reference to the content of any

---

[3] *Reed* involved a law which regulated the size, location and duration of temporary signs, and which had different requirements based on whether a sign was ideological, political, or directional. 135 S.Ct. at 2224-25. The Supreme Court determined that the law was "content based on its face." *Id.* at 2227.

speech, and there is no evidence that the Ordinance was enacted because the LFUCG disagreed with any message being conveyed.

**The bases for the Ordinance**

The LFUCG Council held four public hearings (on August 11, 2015, October 11, 2016, January 17, 2017, and March 2, 2017) to receive comment and discuss what ultimately led to the passage of the Ordinance. Those hearings can be found online at: http://lfucg.granicus.com/MediaPlayer.php?view_id=4&clip_id=3734;

http://lfucg.granicus.com/MediaPlayer.php?view_id=4&clip_id=4082;

http://lfucg.granicus.com/MediaPlayer.php?view_id=4&clip_id=4144;                             and

http://lfucg.granicus.com/MediaPlayer.php?view_id=4&clip_id=4190.   The comments and discussion at those hearings focused exclusively on issues and concerns regarding litter, blight, safety, storm water drainage, and water quality. No one who spoke at the hearings expressed any disagreement with the content of *The Community News* (or any other unsolicited written materials), or the content of *The Lexington Herald-Leader*. The LFUCG detailed the comments and complaints made in the public hearings in its response to the Herald-Leader's motion for a preliminary injunction [Doc #: 21; Page ID# 223 – 225] and adopts that response as part of this memorandum.

In addition to the comments and complaints made during the public hearings, complaints were expressed in written messages sent to the LFUCG by Fayette County residents. For example:

➢       On January 5, 2015, Gina Lowry complained to her Councilmember that unsolicited materials delivered by the Herald Leader were **litter**, and that her attempts to stop the

4

deliveries by contacting the Herald-Leader had been **ignored**. [Copy attached to this memorandum as Exhibit **1**.]

> ➤ On February 4, 2015, Cavan Allen complained to the LFUCG Council that flyers were accumulating in front of unoccupied homes and sent the Council a photograph of several flyers **left to accumulate** (and, ultimately, deteriorate), at a home in his neighborhood. Allen stated: "I have taken to carrying a trashbag on my evening walks to pic [sic] up the flyers that are a week old, but I left this home alone just to see what would happen." [Copy attached to this memorandum as Exhibit **2**.]

> ➤ On February 5, 2015, Neil Brown asked that something be done about the unsolicited advertising materials being delivered in his neighborhood and stated: "The problem is **the bags** that they put the advertisements in **blow away** in the wind and nobody hardly ever picks up the advertisements off their driveways in a timely manner and those **blow around into the street, and it looks bad**." [Copy attached to this memorandum as Exhibit **3** (emphasis added).]

> ➤ On April 23, 2015, Carol Pauly wrote the Council to encourage regulation of unsolicited written materials and noted that few issues of *The Community News* actually land in someone's driveway, and the papers **remain on the ground for months** making the neighborhood **look very trashy**. I know of no other business that is allowed to advertise its services by tossing fliers on the ground with the hope that someone will pick them up, let alone read them." [Copy attached to this memorandum as Exhibit **4** (emphasis added).]

> ➤ On April 30, 2015, James Ratliff complained to the Council about "the local newspaper and **phone book** companies" leaving unsolicited materials on "walks, driveways, porches and yards." He noted: **"It can be a water quality & refuse disposal problem. Plus, when these items are thrown onto property it gives the criminal element another mechanism**

5

to assess whether a residence is vacant or occupied.” [Copy attached to this memorandum as Exhibit **5** (emphasis added).]

> On June 23, 2015, Phyllis Surgener noted that older people in her neighborhood were not able to get out to pick up materials being thrown in their yards and driveways. She complained again on June 24, 2015, this time about a woman delivering handbills by **“throwing them out the window while trying to drive”** and talk on her phone, resulting in the handbills **being put “everywhere but the right place.”** [Copies attached to this memorandum as collective Exhibit **6** (emphasis added).]

These and other complaints (none of which mentioned the content of *The Community News* or any other unsolicited written materials), caused the Planning and Public Safety Committee of the LFUCG Council to hold a public hearing on the issue on August 11, 2015.  At that hearing, representatives of the Herald-Leader acknowledged that it and the Council had received complaints about the delivery of The Community News but assured the Committee that it was addressing those complaints, and that it had a sophisticated, extensive, and reliable system in place to make sure that issues of *The Community News* did not accumulate in front of residences, and that residents could easily opt out of receiving *The Community News*.  [Video of August 11, 2015 public hearing, beginning at 39:40.] In this light, the Committee decided to postpone further action on the issue for at least six months, both to allow additional study, and in the hope that the delivery issues that had led to the complaints would resolve. Unfortunately, the issues, and complaints did not resolve.  For example:

> On August 26, 2015, Councilmember Peggy Henson contacted Rufus Friday (publisher of the Herald-Leader), to let him know that she had received delivery of a copy of *The Community News,* even though she had requested that delivery stop. Henson stated: “This is not

6

meant to be a complaint, as I am much more tolerable than that, but to reiterate the need for improvement. The Herald-Leader provides an excellent product and I would really like to make this work." Friday was apparently upset to receive this report, as he passed it on to the entity retained to deliver *The Community News*, stating:

> "Gentlemen, this is utterly embarrassing. I just met face to face with Councilmember Peggy Henson-the lead person on the proposed ordinance-one week ago in her office assuring her we were committed to quality service and this happens. This is totally unacceptable. The continued actions and performance continue to place me in a very uncomfortable position. She is a subscriber [of *The Lexington Herald-Leader*] and still getting a Community News. And to top that off, **it was thrown in the street at the edge of her driveway**."

[Copy of email chain attached to this memorandum as Exhibit **7** (emphasis added).]

➤ On September 9, 2015, Jim Dickinson complained to Councilmembers that the "indiscriminate tossing of flyers onto driveways, front yards, and sidewalks" had been a nuisance in the Aylesford neighborhood for some time, and specifically complained that the "wholesale distribution of these 'informational' flyers in **small piles in front of the apartment buildings** rather than at the doorway of each apartment **creates a great deal of litter**." [Copy attached to this memorandum as Exhibit **8** (emphasis added).]

➤ On September 9, 2015, Bill Curry wrote to a Council Aide to report that he had phoned five times to get deliveries stopped, without success, and had also gone in person to the Herald-Leader building to stop deliveries. On October 14, 2016, Curry wrote again to express his support for "limiting advertising, Herald Leader Community News, **Telephone Books, Pizza advertising of all sorts being thrown in driveways, gutters, sidewalks**, placed in front doors, etc." [Copies attached to this memorandum as collective Exhibit **9** (emphasis added).]

➤ On February 25, 2016, Barbara Szubinska complained to her Councilmember about the "dumping" of ads on private property, which "**washes into our vulnerable storm**

7

**drains**" and inquired about the status of an ordinance which would "prohibit dumping ads from the car." [Copy attached to this memorandum as Exhibit **10** (emphasis added).]

Consequently, the Planning and Public Safety Committee conducted a second public hearing on the issue on October 11, 2016, and a third public hearing on January 17, 2017. Ultimately, the full Council approved the Ordinance at a public meeting on March 2, 2017.  As with the first public hearing, no one who spoke about the Ordinance during the second, third, and final public hearings expressed any disagreement with the content of *The Community News* or *The Lexington Herald-Leader*. Instead, the discussion concerned litter, blight, safety, and storm water.

In addition to considering the complaints of constituents, the Planning and Public Safety Committee also considered information provided by Charles Martin, Director of the LFUCG Division of Water Quality. Martin advised the Committee of concerns about storm water problems associated with unsolicited materials washing into storm drains and specifically informed the Committee that "[u]nsolicted materials tossed on driveways and laws amount to litter …. and can wash into the public storm sewer system and end up deposited on the banks of our creeks and streams or hung up in vegetation, which is not only unsightly but pollutes our waterways." [A copy of Martin's memorandum to the Committee is attached to this memorandum as Exhibit **11**.] Martin supplemented his memorandum through a declaration filed in this action, in which he explained that the LFUCG is subject to a Consent Decree[4] which requires it to reduce discharge of pollutants into the storm water system, and that an ordinance which requires deliveries away from the street (where storm drains are located) will promote compliance with the Consent Decree. [Martin's declaration was filed in this action as Doc. #:21-7]

---

[4] The Consent Decree was entered in an action brought against the LFUCG in 2006 by the United States of America (on behalf of the Environmental Protection Agency), and the Commonwealth of Kentucky. It was entered as Document #: 77 in Civil Action 5:06-CV-00386-KSF on January 3, 2011.

Martin was also deposed in this action and testified that as late as 2005, the LFUCG did not have procedures in place to minimize problems caused by storm water, including pollution. [Martin depo. at 36-37.][5] This caused the United States EPA to inform the LFUCG that it had "the worst storm water program in the region," and contributed to the EPA filing the suit against the LFUCG, which led to the Consent Decree, and numerous changes by the LFUCG regarding storm water and sanitary sewer issues. [*Id*. at 36-37.] If the LFUCG fails to meet the numerous standards mandated by the Consent Decree it is subject to penalties. [*Id*. at 7.] To comply with the requirements of the Consent Decree, the LFUCG hired nine environmental inspectors to oversee various programs required by the Consent Decree and implemented a storm water quality fee to fund the required programs. [*Id*. at 15-17.]

The "pollution" the LFUCG is required to manage under the Consent Decree includes litter. [*Id*. at 8-11 ("anytime you have a collection of something that is randomly just left uncontrolled, that it has a potential of being pollution."] To manage litter, the LFUCG utilizes programs to educate the public of the risks associated with the uncontrolled disposal of paper, plastic, and other items, sponsors cleanups, and hires contractors to remove litter that has collected in drains, culverts, detention areas, and streams. [*Id*. at 9-11.] In just one year the LFUCG allocated $150,000 of the money collected through the storm water quality fee just to litter. [*Id*. at 29.] And in just the first three months of 2018, contractors retained by the LFUCG removed 44 tons of litter from streams and drainage ways n Fayette County. [*Id*. at 19.] As Martin summarized: "We spend a lot of time on litter. When we entered into the consent decree and agreed to do the storm water fee, you know, we knew we had to fund a lot of problems that were

---

[5] Martin will be out of state on the date of the June 25, 2018 trial, and the LFUCG therefore attached his entire deposition, including exhibits, to this memorandum as Exhibit **12**.

specifically required by the consent decree." [*Id*. at 28.] As to the Ordinance, Martin stated his belief that the Ordinance furthers the objectives of the Consent Decree; specifically:

> [T]he objects of the consent decree is to abate or eliminate pollution of the waters of the Commonwealth or the waters of the United States, and that, in my opinion, is that unsolicited materials that are left uncontrolled in a way that they can be quickly moved into the storm sewers or into waterways, basically, is in conflict with what the objects of the consent decree is, because they become pollution.

[*Id*. at 13.]

Mark Barnard, LFUCG Chief of Police, also provided a memorandum to the Committee, in which he expressed concerns for public safety from unsolicited materials collecting in front of residences. Specifically, he noted that "[u]nsolicited circulars/flyers can leave a neighborhood appearing neglected. Circulars left to clutter around a residence tend to indicate that there is no surveillance of the property or that a home may be abandoned. These conditions do correlate to an increased likelihood of residential burglary and other related items." [A copy of Barnard's memorandum is attached to this memorandum as Exhibit **13**.]

Ronnie Bastin, (the former LFUCG Police Chief and Commissioner of Public Safety), did not present any information to the Committee, but he did confirm Chief Barnard's concerns in a declaration he provided in this action. [See Doc #: 21-6, Page ID# 292.] He also expanded on those concerns by noting:

> Unsolicited deliveries are a greater concern than solicited deliveries, because unsolicited deliveries are more likely to not be removed from or accumulate at unoccupied homes, because the homeowner is not aware the delivery is being made, and so cannot stop the delivery, or make arrangements to have the delivery collected. Similarly, vulnerable homeowners are less likely to be outside their homes on a regular basis, and therefore not aware that unsolicited materials have been delivered.

He also noted that deliveries to porches and doors are more likely to be collected, and less likely to be visible to persons who might be trying to determine if anyone is home.

10

Bastin was deposed in this action and confirmed the statements in his declaration. For example, he testified that the closer you get deliveries to the door of a residence, the less likely the materials will accumulate and give the appearance the residence is unoccupied, and that this is particularly so for unsolicited deliveries, as the occupant is more likely to be unaware of an unsolicited delivery, and less likely to collect it. [Bastin depo. at 25-28 (copy of referenced pages attached to this memorandum as Exhibit **14**.]

### Lack of evidence of bad faith motive or attack on content

Although the Herald-Leader now claims that the real purpose of the Ordinance was to punish it for the content of *The Community News* or *The Lexington Herald-Leader*, it did not make that claim prior to this action. For example, *The Lexington Herald-Leader* reported on September 8, 2015, that "[t]he proposed ordinance was prompted[6] by complaints about the weekly Community News which residents say is often left on driveways, sidewalks and other areas. Council members said they were concerned about littering and public safety." [Copy of article attached to this memorandum as Exhibit **15**.]

On August 20, 2015, Herald-Leader Publisher Rufus Friday wrote Councilmember Henson and suggested that the Planning and Public Safety Committee might not be fully aware of the impact of the proposed ordinance and noted that if the ordinance was passed it would affect **"businesses such as painters, general contractors, and landscapers who solicit business by leaving leaflets at home"** and distribution of materials by "Churches and non-profits." [Copy of message attached to this memorandum as Exhibit **16** (emphasis added).] Several employees of the

---

[6] Herald-Leader Publisher Rufus Friday testified at the April 19, 2017, injunction hearing that courier delivery of *The Community News* began in October of 2014, and that the Herald-Leader, at least at that time, was delivering approximately 130,000 copies of *The Community News* each week. [Transcript of Injunction Hearing, Doc #:39; Page ID #: 459, 466.] The overnight increase in the quantity of unsolicited deliveries by 130,000 per week likely did prompt an increase in complaints about unsolicited deliveries, but as the *The Herald-Leader* reported, the complaints concerned litter and public safety, not the content of *The Community News*.

11

Herald-Leader who attended the October 11, 2016, Planning and Public Safety Committee hearing prepared internal reports of the hearing, none of which suggested that the Committee was upset with the content of *The Community News*, or that the Ordinance was an attack on content. For example, Judson Souers reported that Councilmember Henson: "Thanked the Herald-Leader but used other parties who are not as responsible than us to keep alive the possibility of passing the ordinance." [Copy of note attached to this memorandum as Exhibit **17**.] Beth Musgrave reported that "[Councilmember] Stinnett and others brought up that there are other issues with circulars not delivered by the Herald-Leader." [Copy of note attached to this memorandum as Exhibit **18**.] And Rufus Friday reported:

> "**The focus** of [the Committee's] concerns **now** were **strictly on 'public safety' and 'water quality** (items ending up in storm drains) issues' **and** how **the delivery of phone books and other matter of advertisements** were showing up in the community. They acknowledged the work we had done since last September to address constituent concerns on delivery of our product; even saying that we had done an exceptional job here, but **felt the need to continue to move this to the full council for a vote due to public safety issues primarily now with other *unwanted* products (e.g. phone books, cable, pizza flyers."**

[Copy of note attached to this memorandum as Exhibit **19** (emphasis added).][7]

These contemporaneous and unguarded reports from Herald-Leader representatives belie the Herald-Leader's claim that the Ordinance was based on a disagreement with the content of *The Community News* and *The Lexington Herald-Leader,* rather than on concerns about litter, safety, and water quality. Indeed, the fact that prior to this action the Herald-Leader never claimed publicly or internally that the Ordinance was based on objections to the content of *The Community*

---

[7] Friday wrote similar summaries after an update on the ordinance at a December 6, 2016, meeting, and after the January 17, 2017, hearing, but, again, did not mention any concerns that the ordinance was an attack on the content or message of *The Community News* or *The Lexington Herald-Leader*. [Copies of these summaries are attached to this memorandum as collective Exhibit **20.**]

*News* or *The Lexington Herald-Leader* demonstrates that the Herald-Leader's claim in this action that the Ordinance was really about content is nothing more than a concocted litigation strategy.

Moreover, the Herald-Leader did not present any evidence at the April 19, 2017, injunction hearing that the Ordinance was motivated by a disagreement with the content of *The Community News* or *The Lexington Herald-Leader*. In fact, while Rufus Friday noted that he took exception to persons at the LFUCG referring to *The Community News* as an "advertising circular" he admitted in response to questions from the Court that no one at the LFUCG expressed disagreement with any message or content in the advertising in *The Community News.* [Transcript of Injunction Hearing, Doc #:39, Page ID#: 462-63.]

Finally, in response to an interrogatory from the LFUCG asking the Herald-Leader to "describe, in detail, all bases" for its contention that the LFUCG did not act in good faith in enacting Ordinance No. 25-2017, the Herald-Leader responded by stating only that "The Ordinance, as adopted, was claimed by the Defendant to target delivery of all unsolicited material, when, in fact, the Ordinance was intended to target The Community News." [Herald-Leader response to Interrogatories 15 and 16 propounded by the LFUCG, copy attached as Exhibit **21**.] This naked statement is nothing but a self-serving conclusion, and not evidence that the Ordinance was intended to target *The Community News and* constitutes a tacit admission by the Herald-Leader that it has no evidence that the LFUCG acted in bad faith in passing the Ordinance by basing the Ordinance on a disagreement over content. And, as mentioned above, the Herald-Leader conceded in internal notes and memoranda that the Ordinance targets ***all*** unsolicited written materials, including phone books, coupons, and circulars.

## ARGUMENT

Content based speech restrictions are subject to "strict" scrutiny, while content neutral restrictions undergo only "intermediate" scrutiny to determine if the restriction is narrowly tailored to serve a significant governmental interest and leaves open ample alternative channels for communication.  *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989).  A "regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed." *Reed*, 135 S.Ct. at 2227.  The first step to determining whether a law is content based is to "consider whether a regulation of speech 'on its face' draws distinctions based on the message a speaker conveys." *Id.*  The Herald-Leader has not, and cannot dispute the fact that the LFUCG's Ordinance is facially content neutral because it governs the delivery of ***all*** unsolicited written materials without regard for the identity of the speaker, the contents of the material, or the message to be conveyed.

As this Court has previously noted, regulations that are content neutral on their face will nonetheless be treated as content based if they "cannot be justified without reference to the content of the regulated speech, or [if they] were adopted by the government because of disagreement with the message [the speech] conveys.'" 259 F. Supp. 2d at 663 (quoting *Reed*, 135 S.Ct. at 2227 (quoting *Ward*, 491 U.S. at 791))).  The LFUCG's Ordinance is justified without reference to the content of the regulated speech and there is no evidence that the LFUCG adopted the Ordinance because it disagreed with any message conveyed in *The Herald-Leader, The Community News* or any other unsolicited written materials.  Accordingly, the Ordinance is subject only to intermediate scrutiny, which is satisfied in this case.

> **A.    The Ordinance is justified without reference to the content of the regulated speech.**

14

The Ordinance is justified by the LFUCG's interests in reducing litter and visual blight and protecting private property and the city's storm water system from the haphazard delivery and accumulation of unsolicited written materials on driveways, lawns and roadways in Fayette County.[8]  Moreover, as this Court has noted, the distinction between deliveries of solicited and unsolicited written materials "***does not go to content***."  259 F. Supp. 3d at 666 (emphasis added). The Court explained:

> The distinction between these types of materials ***does not go to content***, but rather to the manner in which the materials are delivered. Individuals or businesses know solicited materials will be delivered to their premises, and they have agreed to that delivery. In fact, they expect it. Practically, solicited materials are more likely to be picked up and disposed of properly.
>
> Unsolicited materials, on the other hand, are those that individuals or businesses have not expressly agreed to receive. The concern with these materials is that they will remain where they were distributed because the recipient has less interest in retrieving them.

*Id.* (emphasis added).

The Sixth Circuit also noted that the LFUCG's goals of reducing visual blight and litter do not depend on the content of the regulated materials, but on the simple fact that the materials are unsolicited. 879 F.3d at 231 ("In light of the millions of unsolicited materials delivered in its community each year, the City has a reasonable basis to believe that restricting such deliveries to the six locations set forth in the Ordinance will bring about a more consistent esthetic. In addition, requiring all unsolicited materials to be delivered to consistent, predictable locations could further reduce the visual impact of such materials by increasing the chances that recipients will find and collect the materials."). Thus, the risks created by the unregulated delivery of

---

[8] This Court and the Sixth Circuit have each recognized the substantial governmental interests underlying the Ordinance. See 879 F.3d at 228 n.2; 259 F. Supp. 2d at 665, 667.

unsolicited written materials apply equally to all such materials, without regard to their content or message, and the LFUCG's justification for the Ordinance is not content based.

In *Reed*, the Supreme Court cited *Clark v. Community of Creative Non-Violence,* 468 U.S. 288 (1984), as presenting a restriction that was "justified without reference to the content of the regulated speech." *Reed*, 135 S.Ct. at 2228. *Clark* involved a planned demonstration on the Mall and in Lafayette Park in Washington D.C. (both of which are under the jurisdiction of the National Park Service), designed to call attention to the plight of the homeless. The demonstrators requested a permit to erect approximately 150 tents where homeless persons would sleep during the demonstration period. *Clark*, 468 U.S. at 291-92. The Park Service granted the request to erect the tents but denied the request to allow sleeping in the tents, based on a regulation that precluded the use of temporary structures for sleeping outside of designated camping areas on national park property. *Id*. The demonstrators appealed the denial.

The Supreme Court noted that restrictions on the time, place, and manner of speech are valid if they "are justified without reference to the content of the regulated speech." *Id*. at 293. It determined that the camping restriction was justified by the need to maintain the parks in "an attractive and intact condition, readily available to millions of people who wish to see and enjoy them." *Id*. at 296. The Court concluded that the restriction was justified without reference to the content of the speech being regulated because the potential harm caused by camping outside designated areas could result just as easily from demonstrators and non-demonstrators, and that all persons desiring to use the parks must comply with the rules, just as all persons must "observe the traffic laws, sanitation regulations, and laws to preserve the public peace." *Id*. at 298.

16

Accordingly, the law was a valid time, place and manner restriction that did not violate the demonstrators' rights under the First Amendment. *Id.*[9]

Since *Reed*, several Circuit Courts have considered whether laws that are content neutral on their face are nonetheless content based by examining the lawmaker's justifications and motivations. For example, in *A.N.S.W.E.R. Coal. (Act Now to Stop War & End Racism) v. Basham*, 845 F.3d 1199 (D.C. Cir. 2017), the D.C. Circuit addressed a challenge to a regulation authorizing the Presidential Inaugural Committee to construct and administer ticketed bleacher viewing and access areas along the inaugural parade route. The Court found the regulation to be justified without reference to the content of any speech because the purpose for restricting access along the parade route was "unrelated to the content of expression" that any protestors or supporters wished to make in those areas. *Id.* at 1210-11 (noting "[t]he regulation itself is agnostic as to whether the persons to be seated will even be supporters of, or chosen by, the incoming president, let alone whether they will express themselves in any particular way."). Concluding that the regulation was "not a 'regulation of speech,'" but a "regulation of the places where some speech may occur," the Court found it to be content neutral and subject only to intermediate scrutiny. *Id.* at 1209.

Likewise, in *Josephine Havlak Photographer, Inc. v. Village of Town Oaks*, the Eighth Circuit upheld an ordinance that banned all commercial activity in a public park without a license. 864 F.3d 905 (8th Cir. 2017). The plaintiff complained that the ordinance burdened the speech rights of commercial photographers while allowing noncommercial photographers to conduct the same activities without a license. The Court concluded that the ordinance was not

---

[9] The Court also rejected the idea that the rights of the demonstrators could be better protected by requiring the Park Service to choose a less-restrictive means of protection, noting that the judiciary did not have "authority to replace the Park Service as the manager of the Nation's parks" and that the judiciary was not endowed "with the competence to judge how much protection of park lands is wise and how that level of conservation is to be attained." *Id*. at 299.

content based because it did not single out any activity based on the message or the messenger but applied equally to all commercial activities in the park, from commercial photographers to hot dog vendors. *Id*. at 914.  Finding that the government enacted the ordinance not to restrict speech, but to allow a lawful avenue for expression through the permitting process, the Court concluded that there was no evidence of "any governmental purpose to burden any particular speech." *Id*. at 915.

Like the speech restrictions in these cases, the LFUCG's Ordinance is content neutral on its face because it applies equally to all unsolicited written materials without singling out any materials for different treatment based on the speaker or the content.  The Ordinance is also justified without reference to any message conveyed by the regulated materials because the LFUCG's goals regarding litter, visual blight, safety, and storm water do not relate to the content of any specific written materials, but only to the unsolicited nature of the deliveries. *See, e.g., Hucul Advert., LLC v. Charter Twp. of Gaines*, 748 F.3d 273, 277 (6th Cir. 2014) (addressing a local sign ordinance and finding the city's goals of promoting traffic safety and aesthetics and preserving property values to be "justified without reference to the content of the regulated speech").  Accordingly, the LFUCG's Ordinance is both facially content neutral and justified without reference to the content of the regulated speech.

Finally, the Court should reject any contention by the Herald-Leader that the LFUCG has not proved that driveway deliveries of *The Community News* cause litter or blight.   Again, the Ordinance applies to ***all*** deliveries of ***all*** unsolicited written materials, not only to deliveries made by the Herald-Leader, and as previously discussed, numerous persons complained of the litter and other issues arising from unsolicited written materials being left on driveways and lawns in Fayette County, and the Director of the LFUCG Division of Water Quality and the

18

LFUCG Chief of Police addressed the problems and risks associated with uncontrolled delivery of unsolicited materials.

As previously discussed, Charles Martin, Director of the LFUCG Division of Water Quality, highlighted the litter, blight, and pollution resulting from large amounts of unsolicited written materials being delivered to locations where they are less likely to be discovered, and more likely to wash into the storm water system, and the resulting issues and potential penalties under the Consent Decree. As Martin testified:

> [Uncontrolled items end up] blowing or floating into the storm sewer system, you know. Most of the storm sewer system along streets and in developed areas have different types of storm inlets and stuff, and so somehow, it migrates to that – that storm inlet because it's the lowest part of the street. That's why it's the drainage area.
>
> And so pollution, as its left around, finds it's way into the storm sewers. It either clogs up that storm sewer and creates a maintenance problem for us and a potential public safety problem for the citizens or that if it passes through that storm sewer system, it ends up in a creek, which then subjects us to some type of enforcement action, potentially, because it is pollution into the waters of the Commonwealth.

[Martin depo. at 11.]

The Sixth Circuit recognized that the LFUCG had a "reasonable basis" to believe that the Ordinance "will bring about a more consistent esthetic" and "further reduce the visual impact of [unsolicited] materials by increasing the chances that recipients will find and collect the materials." 879 F.3d at 230.  Although the Herald-Leader faults the LFUCG for not conducting additional analysis or surveys before passing the Ordinance, the law does not require such studies. *See, e.g., DiMa Corp. v. Town of Hallie*, 185 F.3d 823, 829 (7th Cir. 1999) ("The First Amendment does not require a city, before enacting such an ordinance, to conduct new studies or produce evidence independent of that already generated by other cities, so long as whatever

19

evidence the city relies upon is reasonably believed to be relevant to the problem that the city addresses") (quoting *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 51 (1986)).  As the Sixth Circuit noted in response to the same argument by the Herald-Leader in the prior appeal, "[c]ities may generally rely on such data [from other cities] without enduring the expense of conducting their own research" and the evidence in this case provides "a sufficient basis to conclude that the Ordinance will reduce litter because it requires written materials to be securely fastened to a front door, left near a front door, or delivered directly to a resident." 879 F.3d at 230 (citation omitted).

In summary, there is no merit to the Herald-Leader's contention that the LFUCG has failed to identify a sufficient justification for the Ordinance. And there is no merit to any argument that the justifications for the Ordinance are *not* related to the content or message of the regulated speech.

**B.    There is no evidence that the LFUCG adopted the Ordinance because it disagreed with any message conveyed by the unsolicited written materials.**

As previously discussed, the Herald-Leader apparently contends that the LFUCG enacted the Ordinance in bad faith, as it asked the Court to allow it to take discovery to test the "*bona fides*" of the Ordinance.  That discovery is complete, and the Herald-Leader still cannot point to any evidence that would support a finding that the LFUCG Council intended to target *The Community News* or that the Ordinance was motivated by a disagreement over the content or message conveyed by *The Community News* or any other unsolicited written materials. Surely if the Herald-Leader believed the Ordinance was intended to attack its message, it would have said so, either to the LFUCG Council, or in its internal memoranda, but it did not.

20

All the evidence in the record demonstrates that the Ordinance was designed to address the risks created by the haphazard delivery of *all* types of unsolicited written materials, including not only *The Community News*, but also phone books, coupons, circulars and other materials. The Herald-Leader's theories and speculation concerning the intent behind the Ordinance are not sufficient to show the Ordinance to be content based. *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 652 (1994) ("Appellants' ability to hypothesize a content-based purpose for these provisions rests on little more than speculation and does not cast doubt upon the content-neutral character of [the restriction on speech].").  Likewise, unsupported suspicions and bare allegations are not sufficient to withstand the present motion for summary judgment.  *See, e.g., Lewis v. Philip Morris Inc.*, 355 F.3d 515, 533 (6th Cir. 2004) ("In order to survive a motion for summary judgment, the non-moving party must be able to show sufficient probative evidence [that] would permit a finding in [his or her] favor on more than mere speculation, conjecture, or fantasy.") (internal quotations omitted).  Finally, "[i]t is a familiar principle of constitutional law that [the] Court will not strike down an otherwise constitutional statute on the basis of an alleged illicit legislative motive." *Turner Broad. Sys.*, 512 U.S. at 652 (citations omitted).

The evidence in this case is in stark contrast to cases where facially neutral regulations have been found to be content based because of discriminatory intent or a disagreement with the message conveyed.  For example, *Sorrell v. IMS Health Inc.*, 564 U.S. 552 (2011) (referenced in *Reed*, 135 S.Ct. at 2228), involved a Vermont law prohibiting pharmacies from selling physician prescriber information to pharmaceutical companies for use in marketing their drugs. Although the law appeared content neutral on its face, the Supreme Court determined that the language used in the law, and the exceptions permitted under the law, demonstrated that it was enacted with an intent to disfavor certain speech. *Id.* at 563-65.   For example, the law allowed

21

pharmacies to sell the same prescriber information to private or academic researchers, but not to pharmaceutical marketers. *Id*. at 563.  The law also expressly barred pharmacies from disclosing the information for marketing purposes and barred pharmaceutical manufacturers from using the information for marketing. *Id*.  And the legislative history demonstrated the lawmakers' belief that the marketing practices of pharmaceutical manufacturers "are often in conflict with the goals of the state." *Id*. at 565.  On those facts, the Court concluded that the law was content based because it was designed to burden "disfavored speech by disfavored speakers." *Id*. at 564.

The Ordinance at issue in this case is not like the law addressed in *Sorrell*.  The Vermont lawmakers enacted legislation targeting a specific type of communication to prevent marketing activities that were expressly disapproved of by the lawmakers.  In this case, the Ordinance applies equally to all unsolicited written materials and does not treat any material differently based on the speaker or the message conveyed.  As previously discussed, the Herald-Leader's own representatives recognized that the Ordinance would apply to ***all*** unsolicited materials during the discussions that led to the passage of the Ordinance, and they never claimed that the ordinance was intended to attack the content of *The Community News* or *The Lexington Herald-Leader*. Rufus Friday also conceded during the injunction hearing before this Court that no one at the LFUCG had expressed disagreement or concern regarding the content of *The Community News*.

A facially neutral law was determined to be the result of a discriminatory motivation in *Eichman v. United States,* 496 U.S. 310 (1990) (referenced in *Reed*, 135 S.Ct. at 2228).  *Eichman* involved a challenge to the Federal Flag Protection Act. The Act was passed by Congress after the Supreme Court declared a Texas law which criminalized desecration of venerated objects, including the United States flag, unconstitutional. *Id*. at 313-14. The Act created potential fines

and imprisonment for anyone who "knowingly mutilates, defaces, physically defiles, burns, maintains on the floor or ground, or tramples upon" any flag. *Id*. at 314. It excluded conduct "consisting of the disposal of a flag when it has become worn or soiled." *Id*.

Although the Court acknowledged that the Act was facially content-neutral, in that it did not contain an "explicit content-based limitation on the scope of prohibited conduct," it nonetheless concluded that the government's "interest [was] 'related to the suppression of free expression' and concerned with the content of such expression." *Id*. at 315 (internal citation omitted). The Court noted that the Act was necessarily based on the government's perceived need to protect the flag as a symbol of our nation's ideals, and that the restrictions prescribed by the Act were implicated *only* when treatment of the flag was inconsistent with those ideals. *Id*. at 316. The restrictions against mutilating, defacing, defiling, and trampling, clearly denoted an intent to prohibit acts "likely to damage the flag's symbolic value" while the exemption for disposal of worn or soiled flags denoted an intent to protect acts "traditionally associated with patriotic respect." *Id*. at 317. The Court therefore concluded that the Act was content based because it suppressed "expression out of concern for its likely communicative impact" and could not be justified without reference to the content of the speech of the message expressed. *Id*. at 317-18.

Unlike the speakers in *Sorrell* and *Eichman,* the Herald-Leader has no evidence to support a finding that the LFUCG enacted the Ordinance because it disagreed with or wanted to suppress any message conveyed by *The Community News* or any other unsolicited written materials.  In fact, all the evidence is to the contrary.  Moreover, the Sixth Circuit noted in the prior appeal that the Ordinance "preserves the right for individuals to distribute materials directly to residents and to place them on and around residents' front doors. On its face, then, the

23

Ordinance does not censor or oppress; it merely prohibits materials from being delivered to locations where residents are unlikely to receive their messages." 879 F.3d at 234.

The Supreme Court has also noted that "[t]he broad reach of a [law] can help confirm that it was not enacted to burden a narrower category of disfavored speech." *McCullen v. Coakley*, 134 S.Ct. 2518, 2532 (2014) (citation omitted). Thus, the fact that the Ordinance applies equally to ***all*** unsolicited written materials and does not single out *The Herald-Leader* or *The Community News*, further confirms that it was not enacted with a secret intent of burdening the Herald-Leader or censoring the contents of its speech.  In summary, unlike the evidence of content-based motivations in *Sorrell* and *Eichman*, "there is not even a hint of bias or censorship in the [LFUCG's] enactment . . . of this [O]rdinance."  *Reed*, 135 S.Ct. at 2228 (quoting *Members of City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 804 (1984)).  With no evidence of a bad faith motive on the part of the LFUCG, there is no basis for a strict scrutiny review of the Ordinance.

> **C.    The Herald-Leader's claim that it will be the speaker most affected by the Ordinance and its complaints of increased delivery costs does not change the First Amendment analysis or require heightened scrutiny.**

The Herald-Leader will likely contend that *The Community News* will suffer the brunt of the Ordinance and that the cost of complying with the Ordinance will make continued deliveries cost-prohibitive.  However, "a facially neutral law does not become content based simply because it may disproportionately affect speech on certain topics. On the contrary, '[a] regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others.'" *McCullen*, 134 S.Ct. at 2531 (quoting *Ward*, 491 U.S. at 791).  As the Court noted when addressing a buffer-zone law in *McCullen*, "by limiting the buffer zones to abortion clinics, the Act has the 'inevitable effect' of

24

restricting abortion-related speech more than speech on other subjects" but that fact did not render the law content based and subject to strict scrutiny. *Id.*

A similar disproportionate impact argument was rejected by the First Circuit in *March v. Mills*, 867 F.3d 46 (1st Cir. 2017), *cert. denied*, 138 S.Ct. 1545 (Apr. 16, 2018).  The ordinance there banned noises that could be heard inside a building when made with an intent to jeopardize the health of persons receiving health services within the building or to interfere with the safe and effective delivery of those services. *Id.* at 49.  An abortion protester challenged the ordinance as content based and designed to stop anti-abortion protests. The District Court granted the protestor's request for injunctive relief which was reversed on appeal.  The Court of Appeals concluded that the ordinance was facially content neutral and rejected the protester's argument that strict scrutiny should apply because abortion protestors will likely be the speakers most affected by the law. *Id.* at 56-57 and n. 7; *accord Christian Legal Soc. Chapter of the Univ. of California, Hastings Coll. of the Law v. Martinez*, 561 U.S. 661, 695 (2010) (finding a university policy requiring student organizations to accept all comers to be content neutral, even though students argued that the policy "systematically and predictably burdens most heavily those groups whose viewpoints are out of favor with the campus mainstream"). As these cases demonstrate, the Herald-Leader's contention that the Ordinance will have a disproportionate impact on *The Community News* is not sufficient to turn the facially neutral regulation into a content-based law subject to strict scrutiny.

The Herald-Leader's complaints concerning increased delivery costs are also not a basis for striking down the Ordinance.  The Sixth Circuit addressed the Herald-Leader's cost concerns at length in its opinion in the prior appeal and concluded that "[t]he mere fact that Plaintiff's business cannot survive without this harmful method of delivery does not render the Ordinance

25

unconstitutional." 879 F.3d at 235 (citing *The Pitt News v. Fisher*, 215 F.3d 354, 366 (3d Cir. 2000)).  The Supreme Court has similarly noted that "[t]he First Amendment does not guarantee the right to communicate one's views at all times and places or in any manner that may be desired." *Heffron v. Int'l Soc'y for Krishna Consciousness, Inc.*, 452 U.S. 640, 647 (1981). *Accord Globe Newspaper Co. v. Beacon Hill Architectural Comm'n*, 100 F.3d 175, 193 (1st Cir. 1996) ("The First Amendment does not guarantee a right to the most cost-effective means of distribution . . ..."); *Gannett Satellite Info. Network, Inc. v. Metro. Transp. Auth.*, 745 F.2d 767, 774 (2d Cir. 1984)( "Although the alternative distribution method may be more costly, the First Amendment does not guarantee a right to the least expensive means of expression."); *Jacobsen v. Harris*, 869 F.2d 1172, 1174 (8th Cir. 1989) ("the City need not provide [the plaintiff] the least expensive method of exercising his first amendment freedoms").  Thus, as the Sixth Circuit has noted, "[i]n the end, the fact that a means of communication is efficient and inexpensive does not automatically trump other government interests. At some point, the very cheapness of a mode of communication may lead to its abuse." *Jobe v. City of Catlettsburg*, 409 F.3d 261, 273 (6th Cir. 2005).

The Seventh Circuit's decision in *Patriotic Veterans, Inc. v. Zoeller*, 845 F.3d 303 (7th Cir. 2017), is also instructive on this point.  The law at issue prohibited "recorded phone messages placed by automated dialing machines" unless the recipient knowingly consented to automated calls beforehand or the recorded message was preceded by a message from a live operator who obtained the recipient's consent. *Id.* at 304.  A veterans' group challenged the law and claimed that the requirement of using a live operator would be "prohibitively expensive, so that as a practical matter the statute forbids robocalls in the absence of advance consent by the recipient." *Id*. The veterans' group also argued that such a restriction disfavored political speech.

26

*Id.* at 305.  The Court disagreed, concluding that the statute only "disfavor[ed] cold calls (that is, calls to strangers), but if a recipient has authorized robocalls then the nature of the message is irrelevant." *Id.* The veterans also claimed that the law was content based because it excluded messages from schools to students, messages to persons with whom the caller has a current relationship, and messages advising employees of work schedules. *Id.* Again, the Court disagreed, noting that the law "determines who may be called, not what message may be conveyed" and therefore the law was content neutral *Id.* at 306.  Similarly, in this case, the LFUCG's Ordinance is content neutral because it only determines the ways that unsolicited written materials can be delivered, not what message may be conveyed by those materials.

In conclusion, the LFUCG's Ordinance is facially content neutral, is justified without regard for the content of the unsolicited written materials and was not intended to burden any particular speech because of its content or the message to be conveyed. Thus, the Ordinance is reviewed under intermediate scrutiny and the Herald-Leader's claims of disproportionate impact and increased costs do not heighten the scrutiny to be applied in this case.

## <u>CONCLUSION</u>

For all the reasons addressed above, the Ordinance is content neutral and subject only to intermediate scrutiny under the First Amendment. The Sixth Circuit previously concluded that the Ordinance was likely to satisfy intermediate scrutiny as a restriction narrowly tailored to serve substantial government interests while leaving open ample alternative channels of communication.  879 F.3d at 228-235.  Although that was an interlocutory ruling, discovery has not revealed any evidence to change that conclusion and the LFUCG hereby adopts and incorporates the arguments set out in its earlier filings in this action which show that the Ordinance is a valid time, place and manner restriction that does not violate the First

27

Amendment.  The LFUCG is therefore entitled to a summary judgment dismissing the Herald-Leader's claims.

Respectfully submitted,

*/s/ Keith Moorman*
Keith Moorman
Frost Brown Todd LLC
250 West Main Street, Suite 2800
Lexington, Kentucky 40507
(859) 231-0000
(859) 231-0011

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 11, 2018, the foregoing was filed through the Court's efiling system, with notice sent electronically to all counsel of record by operation of the Court's efiling system.

*/s/ Keith Moorman*
Keith Moorman
*Counsel for the LFUCG*

28