UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
AT LEXINGTON

| | |
|---|---|
| LEXINGTON H-L SERVICES, INC., d/b/a/ LEXINGTON HERALD-LEADER<br><br>Plaintiff,<br><br>v.<br><br>LEXINGTON-FAYETTE URBAN COUNTY GOVERNMENT,<br><br>Defendant. | CIVIL NO. 5:17-CV-154-KKC<br><br><br>**OPINION AND ORDER** |

\*\*\* \*\*\* \*\*\*

This matter is before the Court on cross-motions for summary judgment filed by Defendant Lexington-Fayette Urban County Government[1] (DE 55) and Plaintiff Lexington H-L Services, Inc. d/b/a Lexington Herald-Leader (DE 56). The Herald-Leader seeks to permanently enjoin Lexington from enforcing a recently enacted Ordinance which restricts permissible methods of delivering unsolicited written materials within the City. For the reasons set forth below, the Court finds that the Ordinance is a valid time, place, manner regulation of speech and grants summary judgment in favor of Defendant.

**I. Background**

Since October 2014, the Herald-Leader has distributed a free, weekly, non-subscription publication, *The Community News*, to approximately 130,000 households in Fayette and Jessamine counties. *The Community News*, which is typically four to six pages in length, contains both local news and advertisements. The Herald-Leader contracts with a

---

[1] The Court will refer to the Defendant simply as "Lexington" or "the City."

1

distribution partner who distributes *The Community News* by various means, but primarily via driveway delivery.

Recognizing that some recipients may not want to receive its unsolicited publication, the Herald-Leader maintains a "Do Not Deliver" database. There are a number of ways that residents may be added to the database. The front page of each issue contains a phone number and email for residents to contact and opt-out of delivery. As of April 2017, the database contained 2,899 residents who had opted-out of delivery. Households are also removed if they are listed as "For Sale." And Herald-Leader's distribution partner is instructed not to deliver a new issue of *The Community News* if there is already one in the driveway from a previous delivery.

Lexington Councilmembers began receiving written complaints from residents in 2015 regarding delivery of unsolicited materials from the Herald-Leader and other organizations and urging the City to take action to stop these deliveries. Residents described the materials as litter and reported that their attempts to opt-out of delivery were unsuccessful. (DE 55-2.) Residents also complained that materials were left to accumulate at unoccupied homes, were blown around into the street, and remained on the ground for months unless picked up by residents, creating aesthetic and public safety concerns. (DE 55-2, 55-3, 55-4, 55-5.) These problems were attributed to the practice of tossing these materials on sidewalks, driveways, and yards from moving vehicles. (DE 55-4, 55-5, 55-6.)

As a result of these complaints, the Lexington Planning and Public Safety Committee held a public hearing on August 11, 2015. At the hearing, the Herald-Leader assured the City that it was addressing these complaints and that it had a system in place to ensure copies of *The Community News* did not accumulate in front of residences and that residents could easily opt-out of delivery. The problem was not solved, however, and the City continued receiving complaints. (DE 55-8, 55-9, 55-10.) One Councilmember who had opted out of

delivery even received a copy and complained directly to Rufus Friday, publisher of the Herald-Leader. This prompted him to send an email to the distributor of *The Community News* describing the problem as "unacceptable" and worsened by the fact that it was "thrown in the street at the edge of her driveway." (DE 55-7.)

Three more public hearings were held on the issue on October 11, 2016, January 17, 2017, and March 2, 2017, when the Council ultimately approved the Ordinance at issue. Prior to passing the Ordinance, the Committee also considered memorandums submitted by Charles Martin, Director of the Division of Water Quality, and Mark Barnard, the Chief of Police. Director Martin expressed concerns that unsolicited materials tossed on driveways could wash into the public storm sewer system and pollute creeks and streams.[2] He also noted that Lexington was required by an Environmental Protection Agency Consent Decree to educate the public about ways to minimize pollution to the City's waterways. (DE 55-11.) Chief Barnard's memorandum noted that unsolicited materials can leave a neighborhood appearing neglected and there accumulation outside households can indicate that a residence is not surveilled or abandoned, leading to an increased risk of burglary. (DE 55-13.)

The Ordinance passed by Lexington restricts the delivery of "[u]nsolicited written materials"[3] to six enumerated locations: (1) "[o]n a porch . . . nearest the front door;" (2) "securely attached to the front door;" (3) "[t]hrough a mail slot;" (4) "[b]etween the exterior front door, if one exists and is unlocked, and the interior front door;" (5) "in a distribution box;" or (6) "[p]ersonally with the owner, occupant, and/or lessee of the premises." Ordinance No. 25-2017 § 14-106(b)(1)–(6). The stated purposes of the Ordinance were reducing

---

[2] Martin supplemented his memorandum with a declaration in this action that the Ordinance would promote compliance with the Consent Decree. Consent Decree, *United States v. Lexington-Fayette Urban Cty. Gov't*, No. 5:06-cv-386 (E.D. Ky. Jan. 3, 2011).

[3] The Ordinance defined unsolicited written materials as "[a]ny written materials delivered to any premises without the express invitation nor permission, in writing or otherwise, by the owner, occupant, or lessee of such premises. Lexington, Ky., Ordinance No. 25-2017, § 14-106(a)(6) (Mar. 2, 2017).

3

"unwanted litter and visual blight caused by unsolicited written materials" and preventing damage to and interference with private property. *Id.* The Ordinance imposes a civil penalty of up to $200 per violation. *Id.* § 14-106(h).

After the Ordinance was passed, the Herald-Leader commenced this action seeking to enjoin its enforcement on the basis that it abridges the Herald-Leader's First Amendment rights by prohibiting its preferred distribution method—driveway delivery—of *The Community News*. The Court previously issued a preliminary injunction against enforcement of the Ordinance which was reversed by the Court of Appeals for the Sixth Circuit. *See Lexington H–L Servs., Inc. v. Lexington–Fayette Urban Cty. Gov't*, 259 F. Supp. 3d 659 (E.D. Ky. 2017), *rev'd*, 879 F.3d 224 (6th Cir. 2018). This matter was set for a bench trial but, during the pretrial conference, the parties agreed that there were no genuine issues of material fact and therefore summary judgment was the appropriate means for resolving this matter. (DE 61.) Accordingly, this matter is now ripe for consideration.

**II. Standard of Review**

A moving party is entitled to summary judgment pursuant to Federal Rule of Civil Procedure 56 "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In order to defeat a summary judgment motion, "[t]he nonmoving party must provide more than a scintilla of evidence," or, in other words, "sufficient evidence to permit a reasonable jury to find in that party's favor." *Van Gorder v. Grand Trunk W. R.R., Inc.*, 509 F.3d 265, 268 (6th Cir. 2007) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). Summary judgment must be entered if, "after adequate opportunity for discovery," a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Tolton v. American*

4

*Biodyne, Inc.*, 48 F.3d 937, 940 (6th Cir. 1995) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (internal quotation marks omitted)).

**III. Analysis**

The parties present two distinct frameworks for how the Court should decide this case. Lexington contends that the Ordinance is a valid time, place, and manner regulation of speech. Both this Court's previous Opinion and Order and the opinion of the Sixth Circuit, focused on this issue when resolving the Herald-Leader's motion for preliminary injunction. In contrast, the Herald-Leader relies on the Supreme Court's decision in *Martin v. City of Struthers*, 319 U.S. 141 (1943) to claim that the First Amendment provides special porteciton to driveway delivery of news and other literature, even if unsolicited. These arguments are considered in turn.

*A. The Ordinance is a valid time, place, manner regulation of speech*

In order for the Ordinance to qualify as a reasonable time, place, and manner regulation of speech, "the law must (1) be content-neutral, (2) serve a significant government interest, (3) be narrowly tailored to serve that government interest and (4) leave open ample alternative channels of communication." *Jobe v. City of Catlettsburg*, 409 F.3d 261, 267 (6th Cir. 2005) (citing *Members of City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 808, 815 (1984)).

Lexington's Ordinance is content- and viewpoint-neutral and advances significant government interests. A regulation of speech may be considered content-based "on its face" if it "draws distinctions based on the message a speaker conveys." *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2227 (2015) (quoting *Sorrell v. IMS Health, Inc.*, 564 U.S. 552, 566 (2011)). The City's Ordinance is facially content-neutral because it applies equally to the delivery of all unsolicited materials, without reference to the message or viewpoint they contain. Regulations that are otherwise facially neutral are also considered content-based if they

5

"cannot be 'justified without reference to the content of the regulated speech,'" or if they were "adopted by the government 'because of disagreement with the message the speech conveys.'" *Id.* (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)). The explanations given by the City for passing the ordinance made no reference to the content of *The Community News*. The City's goals were to address litter, visual blight, and public safety concerns created by the distribution of unsolicited written materials. These objectives "have nothing to do with the content of the literature being distributed by the speaker." *Jobe*, 409 F.3d at 268; *see also Hucul Advert., LLC v. Charter Twp. Of Gaines*, 748 F.3d 273, 277 (6th Cir. 2014) (holding a local sign ordinance which "aim[ed] to promote traffic safety and aesthetics and preserve property values" was content-neutral).[4] The City's interest in reducing blight and litter and protecting private property are significant. *See Jobe*, 409 F.3d at 268 ("[T]he ordinance advances two significant government interests: (1) It furthers the government's interest in prohibiting litter and visual blight; and (2) it furthers individuals' interests in having their private property left alone by those who do not have permission to use it.").

Having determined that the Ordinance is content-neutral and advances significant government interests, the Court turns to the remaining two prongs of the intermediate scrutiny analysis: whether the Ordinance is narrowly tailored and leaves open ample alternative channels of communication.

1. *Narrow Tailoring*

A regulation of speech is narrowly tailored "so long as the regulation promotes a substantial government interest that would be achieved less effectively absent the regulation." *Ward*, 491 U.S. at 799. A regulation cannot be invalidated "simply because a

---

[4] The Herald-Leader concedes that the Ordinance is facially neutral, but does not concede that the Ordinance was not motivated by a desire to target the Herald-Leader. But the Herald-Leader states that the City's motives are irrelevant for summary judgment purposes and it does further develop an argument that the Ordinance was motivated by the content of *The Community News*.

court concludes that the government's interest could be served by some less-speech-restrictive alternative." *Id.* at 800. Thus, the fit between the City's means and ends must be a reasonable one. *See Prime Media, Inc. v. City of Brentwood*, 398 F.3d 814, 821 (6th Cir. 2005). Additionally, the City must rely on more than mere "speculation or conjecture" that the Ordinance will further its interests. *Id.*

The Court finds that the Ordinance is narrowly tailored to the City's interest in reducing visual blight and reducing litter.[5] As in *Jobe,* where the Sixth Circuit upheld a city ordinance prohibiting placing posters on vehicles, Lexington's Ordinance "target[s] the precise problems . . . that it wished to correct." 409 F.3d at 270. It is reasonable for the City to believe, based on the millions of unsolicited materials delivered each year and numerous complaints from residents that driveway delivery resulted in these materials accumulating, that restricting that form of delivery would reduce this visual blight. The Lexington Ordinance corrects these problems by restricting delivery to six locations were residents are more likely to collect unsolicited materials. Similarly, limiting the delivery to six locations is also likely to create a more consistent esthetic in the City by preventing haphazard distribution of unsolicited materials.

As to the City's interest in preventing litter, Lexington received complaints that driveway delivery made it more likely that written materials were blown into the street, were they become litter. The Council also considered the memorandum submitted by the City's Director of Division of Water Quality which advised that uncollected materials could wash into the

---

[5] The City has also advanced the interest of reducing damage to and interference with private property. In its opinion reversing this Court's preliminary injunction, the Sixth Circuit found that the City had not shown a sufficient basis to invoke this interest. 879 F.3d at 231. Because the Court finds, consistent with the Sixth Circuit's prior opinion, that the Ordinance is narrowly tailored to reducing blight and litter it will not address whether it is narrowly tailored to the City's interest in protecting private property.

7

public storm sewer system during heavy rains and end up in the banks of creeks and streams or in streamside vegetation.

The Herald-Leader claims that there is no evidence that delivery of *The Community News* causes litter, citing the deposition testimony of Councilmember Farmer. Councilmember Farmer, who voted against the Ordinance, also testified that he believed that the Herald-Leader's opt-out option was an effective means for reducing litter. The belief of one Councilmember, however, does not outweigh the other evidence considered by the City and the opinion of the majority of the Council. The Herald-Leader also points to the City's admission that it has no knowledge of specific storm drains blocked by *The Community News* and Director Martin's testimony that the EPA has never identified newspapers in storm drains as a problem under Lexington's Consent Decree. These arguments, however, misstate the quantum of evidence required for the Ordinance to be upheld. Upholding "common sense explanations for ordinances" like Lexington's "does not require proof that the problem has occurred in the past or an 'elaborate study of their present-day necessity.'" *Pagan v. Fruchey*, 492 F.3d 766, 777 n.9 (6th Cir. 2007) (citing *Jobe*, 409 F.3d 261). The complaints by residents provides a sufficient basis to conclude that driveway delivery of unsolicited written materials results in litter and visual blight and that the Ordinance will further the City's interests in reducing these issues.

The Herald-Leader next argues that the City's Ordinance conflicts with recent Supreme Court case law requiring a "close fit" between the means used by the government and its intended result. *See McCullen v. Coakley*, 134 S. Ct. 2518, 2534–35 (2014) ("[B]y demanding a close fit between ends and means, the tailoring requirement prevents the government from too readily 'sacrificing speech for efficiency.'") (quoting *Riley v. Nat'l Fed'n of Blind of N. C., Inc.*, 487 U.S. 781, 795 (1988)). *McCullen*, however, did not change the law of narrow tailoring; the Court merely applied the long standing narrow tailoring test enunciated in

8

*Ward*. *Id.* (quoting *Ward*, 491 U.S. at 798–799); *see Lexington H–L Servs.*, 879 F.3d at 232 ("Lest any confusion on the point remain, we reaffirm today that a regulation of time, place, or manner of protected speech must be narrowly tailored to serve the government's legitimate, content-neutral interests but that it need not be the least restrictive or least intrusive means of doing so."); *Traditionalist Am. Knights of the Ku Klux Klan v. City of Desloge*, 775 F.3d 969, 978 (8th Cir. 2014) (internal citations omitted) ("It is far from clear that the Court was intending in the *McCullen* abortion case to change the law on narrow tailoring. While quoting its longstanding precedent in *Ward* to define narrow tailoring at no point did the Supreme Court announce a new rule."). *McCullen* involved a state statute which criminalized standing within a thirty-five foot buffer zones outside abortion clinics. *McCullen*, 134 S. Ct. at 2525. The Court found that the statute was overbroad because it "operate[d] to deprive petitioners of their two primary methods of communicating with patients"—one-on-one communications and leafletting. *Id.* at 2536. Abridging those forms of communication "impose[d] an especially significant First Amendment burden" because they had "historically been more closely associated with the transmission of ideas than others." *Id.* Only after making this determination did the Court go on to find that the state had "available to it a variety of approaches that appear capable of serving its interests, without excluding individuals from areas historically open for speech and debate," *id.* at 2539. The Ordinance here is unlike the statute at issue in *McCullen*; it leaves open six delivery methods likely to ensure that message of *The Community News* is received by Lexington residents. There is no evidence on the record suggesting that these remaining methods of delivery would deprive the Herald-Leader of their ability to communicate and therefore the Ordinance does not burden more speech than necessary in achieving its asserted aims.

*2. Alternative Channels of Communication*

Finally, the Court must consider whether Lexington's Ordinance leaves open ample alternative channels of communication. The Sixth Circuit has explained that "[a]n alternative channel of communication can be adequate even when the speaker is denied its best or favored means of communication." *Contributor v. City of Brentwood*, 726 F.3d 861, 865 (6th Cir. 2013) (citing *Phelps–Roper v. Strickland*, 539 F.3d 356, 372 (6th Cir. 2008). Thus, "[t]he key for purposes of the adequate-alternatives analysis is whether the proffered alternatives allow the speaker to reach its intended audience." *Id.*(citing *Phelps–Roper*, 539 F.3d at 372; *Prime Media, Inc. v. City of Franklin*, 181 F. App'x 536, 541 (6th Cir. 2006)).

The Ordinance leaves open ample alternative channels of communication. The Herald-Leader may still distribute, by any method, written materials that individuals have consented to receiving. Unsolicited and unconsented to written materials may still be delivered so long as they are: (1) left on the front porch; (2) securely attached to the front door; (3) inserted in a mail slot; (4) placed between an exterior and interior front door; (5) placed in a distribution box; or (6) delivered personally to the owner, occupant, or lessee. While these may not be the Herald-Leader's preferred methods of distribution, they allow *The Community News* to reach its intended audience.

The Ordinance is similar to those upheld by the Supreme Court in *Frisby v. Schultz*, 487 U.S. 474 (1988) and the Sixth Circuit in *Jobe*. In *Frisby*, the Court found that an ordinance prohibiting picketing that took place "solely in front of a particular residence" left open ample alternative channels for communication because it permitted protestors to march through neighborhoods, go door-to-door to proselytize, distribute literature, and contact residents by telephone. *Id.* at 484. In *Jobe*, the court of appeals upheld an ordinance prohibiting individuals from placing leaflets on cars without the owner's consent because it still

10

"permit[ed] a wide range of leafletting activities." 409 F.3d at 270. Citizens could still distribute literature by waiting in parking lots or on a street and asking the owners if they would like a leaflet, by going door-to-door to talk to hand out leaflets, and by mailing them to residents. *Id.* Even more significant to this case, the ordinance in *Jobe* "expressly allow[ed] citizens to leave leaflets and pamphlets at private residences if they are placed on a porch or securely fastened to prevent them from being blown or scattered about." *Id.* (internal citations and quotation marks omitted). Lexington's Ordinance leaves those same channels open. Like the ordinances at issue in *Frisby* and *Jobe*, the City's Ordinance permits its residents, and the Herald-Leader, to distribute literature in numerous ways which ensure it will reach its intended audience.[6]

### B. *Martin* did not create special First Amendment protection for driveway delivery of newspapers

The Herald-Leader primary argument in support of summary judgment is that the Supreme Court in *Martin v. City of Struthers* created a special protection for driveway delivery of newspapers. 319 U.S. 141. *Martin* involved an Ohio municipal ordinance which completely prohibited door-to-door solicitation and distribution of literature.[7] Martin, a Jehovah's Witness, was convicted under the ordinance when she went door-to-door to distribute flyers advertising a religious meeting. *Id.* at 142. The Court applied a balancing test, weighing the interests of Martin in her First Amendment rights of freedom of speech

---

[6] During the preliminary injunction stage, the Herald-Leader argued that the Ordinance does not preserve ample alternative channels because compliance with the Ordinance would increase the cost of delivery such that it can no longer be distributed. The Herald-Leader does not advance this argument in its Judgment or Response and therefore appears to have abandoned this theory.

[7] The Ordinance at issue in *Martin* stated:

> It is unlawful for any person distributing handbills, circulars or other advertisements to ring the door bell, sound the door knocker, or otherwise summon the inmate or inmates of any residence to the door for the purpose of receiving such handbills, circulars or other advertisements they or any person with them may be distributing.

319 U.S. at 142.

11

and religion, the interests of each "individual householder to determine whether he is willing to receive her message," and the "interests of the community" which through the ordinance sought to "protect the interests of all of its citizens, whether particular citizens want that protection or not." *Id*. at 143. The Court concluded that the ordinance did not safeguard "the constitutional rights of those desiring to distribute literature and those desiring to receive it" and held the ordinance to be an unconstitutional restriction on freedom of speech and press *Id*. at 149.

In coming to this conclusion, the Court stated that "leaving to each householder the full right to decide whether he will receive strangers as visitors" was the preferred means for regulating door-to-door solicitation. Relying on this passage, the Herald-Leader argues that *Martin* requires Lexington to permit driveway delivery of unsolicited newspapers unless residents opt-out. Under this theory, because the Herald-Leader provides an opt-out mechanism for recipients, the Ordinance is unconstitutional.

*Martin* is distinguishable. The ordinance in *Martin* restricted door-to-door solicitation and distribution of pamphlets, a much broader restriction than Lexington's Ordinance which still explicitly permits these methods of distribution. While *Martin* did not apply modern intermediate scrutiny analysis, the opinion can be understood as finding that the ordinance was not narrowly tailored because it "burden[e]d substantially more speech than is necessary to further the government's legitimate interests." *Ward*, 491 U.S. at 799. The ordinance in *Martin* was aimed at "protection of the households from annoyance, including intrusion upon the hours of rest, and . . . prevention of crime." *Martin*, 319 at 144. Those interests, the Court found, could be served by traditional general trespass statutes which "punish[ ] persons who enter onto the property of another after having been warned by the owner to keep off." *Id*. at 147. Requiring that Lexington adopt the opt-out method is unlikely to curb the problem of

litter and visual blight that its Ordinance is aimed at since it is the failure by residents to pick up unwanted literature, on which the opt-out instructions are printed, that results in the litter and blight. And the Lexington Ordinance burdens significantly less speech in furthering these interests by permitting six forms of unsolicited distribution of literature to homes.

Additionally, *Martin* involved a "widespread" method of communication—door-to-door distribution of literature—that had "proved the most effect instrument[ ] in the dissemination of opinion." *Id.* at 145 (quoting *Schneider v. New Jersey*, 308 U.S. 147, 164 (1939)). As the Court more recently recognized in *McCullen*, "[o]ne-on-one communication is the most effective, fundamental, and perhaps economical avenue of political discourse. And handing out leaflets in the advocacy of a politically controversial viewpoint is the essence of First Amendment expression; no form of speech is entitled to greater constitutional protection." 134 S. Ct. at 2536 (internal quotations marks and citations omitted) (quoting *Meyer v. Grant*, 486 U.S. 414, 424 (1988); *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 347 (1995)). Therefore, [w]hen the government makes it more difficult to engage in these modes of communication, it imposes an especially significant First Amendment burden." *Id.* In contrast, driveway delivery of unsolicited materials has never been recognized as traditional, fundamental, or widespread form of expression such that its restriction would create special First Amendment concerns. Instead, the Sixth Circuit has stated the opposite: "There is nothing special about . . . a lawn-that invites others to place leaflets or advertisements on it without the owner's consent." *Jobe*, 409 F.3d at 270.

The Herald-Leader also argues that state and federal courts, relying on *Martin*, have applied *Martin*'s balancing test to strike down governmental attempts to limit residential delivery of free newspapers. These cases, which the Herald-Leader dubs "*Martin*'s progeny"

13

are distinguishable and non-binding in this Court and therefore do not justify foregoing the time, place, manner analysis applied by the Sixth Circuit in *Jobe*.

The first case cited by the Herald-Leader, *Van Nuys Pub. Co. v. City of Thousand Oaks*, 489 P.2d 809 (Cal. 1971), involved a far broader prohibition on distribution of unsolicited written materials. As the court explained, "the ordinance does not limit its criminal sanction to those who strew papers on lawns or sidewalks, but by its terms covers those who merely enter on property to distribute pamphlets to others who may be there, as well as those who, in delivering pamphlets, take care to secure their messages so as to eliminate the hazards of litter."[8] *Id.* at 811–12. Thus, the ordinance passed by City of Thousand Oaks was broader than both the Ordinance passed by Lexington and the ordinance struck down in *Martin* as it required "that a distributor obtain consent prior to the delivery of written material" which, the court determined, "as a practical matter [will] frequently operate to curtail completely this means of communication." *Id.* at 813. In contrast, Lexington's Ordinance permits the distribution of unsolicited written materials to six specified locations and therefore *Van Nuys* is inapposite.

The Herald-Leader also relies on the Third Circuit's decision in *Ad World, Inc. v. Doylestown Tp.*, 672 F.2d 1136 (3d Cir. 1982) in which the court struck down an ordinance which prohibited distribution of "advertising material" without "affirmative request or consent of the person occupying the residence." *Id.* at 1138. Applying intermediate scrutiny, the court found that the ordinance was neither narrowly tailored nor left open ample

---

[8] The ordinance stated:

> No person may throw, cast, distribute, scatter, deposit, pass out, give away, circulate or deliver any handbill, dodger, circular, newspapers, paper, booklet, poster, other printed matter or advertising literature of any kind in the yard or grounds of any house, building structure, on any porch, doorstep vestibule, in any public hallway, or upon any vacant lot or other private property without having first obtained permission of the owner or of an adult resident or occupant thereof.

*Id.* at 810–11.

14

alternative channels of communication. *Id.* at 1142. The ordinance was aimed at reducing burglary due to accumulation of unwanted papers, but the regulation applied only to advertising materials while other "publications [which] could lead to similar accumulation and the same attendant risks" were exempted." *Id.* at 1141. In contrast, recognizing that unsolicited materials are most likely to go uncollected, the Lexington ordinance applies equally to all unsolicited written material regardless of its content. Additionally, the Doylestown ordinance was also broader in scope, prohibiting all distribution of unsolicited advertisements. Ad World sought to deliver its advertisement by "attach[ing] the paper in a plastic bag to a mailbox hook or to a door knob or leave it on the premises." Id. at 1138. Thus, when the Third Circuit cited to *Martin*, it was for the conclusion that "a publisher . . . is a fortiori protected in having a paper delivered door to door and having it *left on the front steps or on the mailbox* of a home." *Id.* (emphasis added). Lexington's Ordinance does not prohibit this type of delivery and therefore *Ad World* is inapplicable.

The Herald-Leader cites a number of additional state cases and a single decision from the Eastern District of New York but fails to explain why the Court should rely on these cases rather than the Sixth Circuit's binding precedent in *Jobe*. The Herald-Leader has strained to present *Martin* as creating a right to provide unsolicited driveway delivery when neither it, nor its most pertinent progeny, specifically addressed that issue. Properly understood, *Martin* stands for the proposition that a government may not place a total prohibition on door-to-door solicitation and leafletting. Outside of that context, and in this circuit, *Jobe* provides the applicable time, place, manner analysis for assessing whether content-neutral restrictions on distribution of written materials are constitutional. Under that analysis, as set forth above, Lexington's Ordinance is valid.

## IV. Conclusion

For the reasons set forth above, the Court **HEREBY ORDERS**:

(1) Defendant's Motion for Summary Judgment (DE 55) is **GRANTED**;

(2) Plaintiff's Motion for Summary Judgment (DE 56) is **DENIED**;

(3) a judgment consistent with this Opinion and Order will be entered contemporaneously.

Dated July 19, 2018.

KAREN K. CALDWELL, CHIEF JUDGE
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY